**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | | |
|---|---|---|---|
| **DARRELL SEYBOLD,** | § | | |
| **PLAINTIFF** | § | | |
| | § | | |
| **V.** | § | **CASE NO.** | 3:21-cv-228 |
| | § | | |
| **CHARTER COMMUNICATIONS, INC.,** | § | | |
| **DEFENDANT** | § | | |

**PLAINTIFF DARRELL SEYBOLD'S ORIGINAL COMPLAINT**


RESPECTFULLY SUBMITTED,


_____

Eric Roberson
Texas State Bar No. 00792803
Kilgore & Kilgore, PLLC
3109 Carlisle Street
Dallas, TX 75204
214-379-0817 Direct
214.969.9099
214.379.0843 Fax
ENR@KilgoreLaw.com

## TABLE OF CONTENTS

I.     THE PARTIES.................................................................................... 1

II.    PROCEDURAL BACKGOUND, JURISDICTION, AND VENUE ............................2

III.   FACTUAL BACKGROUND ...................................................................3

    A.    Seybold Has a Long Record of Being a Superior Employee and Manager ..... 3

    B.    Seybold's Termination Culminated from the Reporting of Charter's
          Improper Behavior that Violated the Sarbanes-Oxley Act, which Flew
          into the Face of Charter's Corporate Culture that Views Standing
          Up for Legal Norms as Corporate Disloyalty ...........................................4

         1.   The First Straw – Seybold Reports and Opposes Improper Retagging
              of Networks to Claim New Revenue That Should Be Renewal Revenue ... 5

         2.   The Second Straw – Seybold Opposes Moving Senior Living RGUs to
              Spectrum Community Solutions (SCS or Residential) While Leaving
              Same Accounts in Enterprise Billing................................................. 7

         3.   The Third Straw – Seybold Opposes Falsification of New Revenue
              Opportunities to Bolster Potential Revenue Valuation .............................8

         4.   The Final Straw – Seybold Opposes Across-the-Board Contract Errors
              Inherent in Charter's Payment Software that Defrauded Employees of
              Millions of Dollars of Commissions .............................................10

    C.    The Harm........................................................................... 14

    D.    The Case is Not Subject to Arbitration ........................................... 14

IV.   LEGAL FOUNDATION .....................................................................15

V.    FIRST CAUSE OF ACTION- SARBANES-OXLEY WHISTLEBLOWING ...……18

VI.   SECOND CAUSE OF ACTION – BREACH OF CONTRACT ...............................19

VII.  JURY DEMAND ..............................................................................20

VIII. PRAYER FOR RELIEF......................................................................20

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **DARRELL SEYBOLD,** | § | |
| **PLAINTIFF** | § | |
| | § | |
| **V.** | § | **CASE NO.** _3:21-cv-228_____ |
| | § | |
| **CHARTER COMMUNICATIONS, INC.** | § | |
| **DEFENDANT** | § | |

### PLAINTIFF DARRELL SEYBOLD'S ORIGINAL COMPLAINT

Darrell Seybold ("Seybold"), by his attorney, files this, his Original Complaint, against Defendant Charter Communications, Inc. ("Charter") pursuant to 18 U.S.C. §1514A within the Sarbanes-Oxley Act of 2002 (SOX), and states as follows:

### I.  THE PARTIES

1.     Plaintiff Darrell Seybold is an individual and former employee of Charter. Seybold resides in Plano, Texas.

2.     Defendant Charter Communications, Inc., is a Delaware corporation with its headquarters and nerve center in Stamford, Connecticut. Charter is a publicly traded corporation and is subject to the jurisdiction of the U.S. Securities and Exchange Commission ("SEC") because it has a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and/or is required to file reports under Section 15(d) of the Securities Exchange Act of 1934. Charter stock is traded on the NASDAQ exchange under the symbol CHTR. The financial information of Charter is included in its own consolidated financial statements.

3.     Charter may be served with process through its registered agent:

Corporate Service Company
211 E. 7th Street, Suite 620
Austin, TX 78701

### PLAINTIFF DARRELL SEYBOLD'S ORIGINAL S COMPLAINT – Page 1 of 21

## II.  PROCEDURAL BACKGROUND, JURISDICTION, AND VENUE

4.      After suffering a retaliatory and wrongful termination due to whistleblowing, on or about February 18, 2020, Seybold timely filed a SOX complaint, case number 6-1730-20-170, with the Secretary of Labor. Seybold alleged that Charter wrongfully terminated Seybold in retaliation for protected SOX whistleblowing activity. Seybold timely filed his SOX complaint with the department of Labor on July 29, 2020.

5.      Pursuant to 18 U.S.C. Section 1514A (B)(1)(b), as 180 days have passed since the filing of Seybold's SOX complaint with the Department of Labor, and there having been no final determination made by the Secretary of Labor, Seybold may file this matter, which is a *de novo* matter. Accordingly, this Court has federal question jurisdiction over the subject matter of Seybold's federal law SOX claim action pursuant to 28 U.S.C. Section 1331.

6.      Seybold also brings a breach of contract claim for unpaid commissions. This court has diversity jurisdiction pursuant to 28 U.S.C. Section 1332 (inclusive of unpaid commissions and attorney fees) and/or pendant jurisdiction of this state-based cause of action pursuant to 28 U.S.C. Section 1367 (a).

7.      This Court has specific personal jurisdiction over Defendant Charter because Plaintiff was employed at Charter's Coppell, Texas offices, which are in Dallas County, Texas.

8.      Venue is appropriate in the Northern District of Texas, and this matter is properly in the Dallas Division, pursuant to 28 U.S.C. Section 1391(b)(2) because the acts or omissions that form the basis of this action occurred within Dallas County in the Dallas Division of the Northern District of Texas.

### III.  FACTUAL BACKGROUND

9.      Seybold asserts the following facts and law establishing that Charter has violated the Sarbanes-Oxley Act by having wrongfully terminated Seybold in retaliation for whistleblowing activity protected by the Act and that Charter breached its commission contract with Seybold, both causing him injury, for which he seeks relief, as follows:

10.      After an eight-year career at Charter and its corporate predecessors, Charter terminated Seybold on or about February 18, 2020.

11.      At the time of his termination, Seybold was employed as a Sales Manager, making a base salary of $115,00 per year, plus commissions and bonuses. In his last full year of employment, Seybold earned wages, bonuses, and commissions of well over $200,000.

**A.      Seybold Has a Long Record of Being a Superior Employee and Manager**

12.      Throughout his eight years of service, Seybold provided superior services to Charter and was recognized for his consistent excellent performance, as follows:

a.   Sales Levels – Seybold had eight consecutive years of at or above 100% Year to Date (YTD) revenue attainment.

b.   Sales and Management Leadership – Seybold has over 15 years in total sales leadership experience within the industry and has managed in two separate verticals at Charter: Charter Enterprise Hospitality (2 years) and Charter Enterprise Healthcare (6 Years) ("Enterprise").

c.   Corporate growth – As a result of consistent sales achievement from the Healthcare Sales team Charter experienced double-digit revenue growth Year Over Year (YOY) for the entire eight years of Seybold's employment.

    d.   Awards and accolades – During his tenure at Charter, Seybold has received the following awards and accolades:

        i.   President's Club 2013,

        ii.   Top Performer Award (#1 Manager in ENTIRE company) 2013,

        iii.   Manager of the Month Sept 2013,

        iv.   Quota Buster Award 2014,

        v.   Quota Buster Award 2015,

        vi.   Quota Achievement Award 2016,

        vii.   Strategic 101%+ Club Award 2017,

        viii.   Strategic 101%+ Club Award 2018, and

        ix.   Featured in company News Wire for landing a huge sale.

    e.   In addition to the above, Seybold obtained clients from previously unpenetrated premier healthcare accounts such as: UTSW Medical Center, US Renal, Nobilis Healthcare, Baylor Scott & White, JPS Health, Cook Children's Medical Center and HCA. Each of these accounts were all penetrated strategically with very positive results in contracts obtained.

13.    Despite this positive record, Seybold was wrongfully terminated in retaliation for repeatedly reporting and opposing illegal corporate activity that violated federal law, including the Sarbanes-Oxley Act.

**B.    Seybold's Termination Culminated from the Reporting of Charter's Improper Behavior that Violated the Sarbanes-Oxley Act, which Flew into the Face of Charter's Corporate Culture that Views Standing Up for Legal Norms as Corporate Disloyalty.**

14.    Following Seybold's termination, Seybold filed for unemployment benefits, which lead to Charter making numerous statements and admissions about Seybold's termination.

15.     During the unemployment benefits hearings, Charter explained the alleged reason and basis for his termination. Charter Spectrum Enterprise initially denied Seybold's claim for unemployment on the grounds he was fired for "Unprofessional conduct and communication that demonstrates lack of leadership." Charter supplied the Texas Workforce Commission with documents it claimed substantiated its statements.

16.     The gravamen of Charter's defense was that Seybold's termination was the pinnacle event of a series of misconduct on Mr. Seybold's part that showed he was unprofessional.

17.     However, on analysis of each of the alleged instances of misconduct, it becomes clear that Charter's use of the term "unprofessionalism" represents a corporate culture where any whistleblowing actions or conduct that questions the legality or legitimacy of Charter's conduct are automatically deemed to be "unprofessional" – even if the activity being questioned is actually illegal, unethical, and/or improper. In other words, the mere act of telling a superior at Charter that certain conduct should be avoided because it is illegal, unethical, or improper, is found by Charter to be an unprofessional act, even if the conduct is in fact illegal, unethical, and/or improper.

18.     Although Seybold's assertions were accurate, and/or made in the good faith reasonable belief that they were accurate, in Charter's mind reporting unlawful behavior and standing up for corporate ethics and fealty to legal requirements was considered disloyal and unprofessional – even if the assertions reported violations of SOX. Ultimately, Charter fired Seybold for this alleged unprofessionalism – that is, Seybold was wrongfully terminated for engaging in whistleblowing conduct protected by the Sarbanes-Oxley Act at 18 U.S.C. § 1514A.

**1.     The First Straw – Seybold Reports and Opposes Improper Retagging of Networks to Claim New Revenue That Should Be Renewal Revenue**

19.     On or about September 2015, Charter started a corporate policy and practice of changing the protocol tagging on circuits from EVPL to ELAN on the same Ethernet customer.

That is, customers were receiving the same basic Ethernet service, but based on the retagging of the customer, Charter was able to claim the ELAN as new revenue despite the fact that Charter had merely disconnected the EVPL network. Based on this retagging, the old account now becomes listed as "New" revenue on corporate reports. Accordingly, analysts, stockbrokers, consumers, and others reading these reports would falsely believe that Charter is actually posting new revenue, which leads to an artificial and false reason to purchase or hold Charter stock.

20.     This retagging occurred under the actions and/or approval of Lynne Bell.

21.     The revenue for at least two years from mid-2015 until mid-2017 was misreported to Wall Street to the tune of over $4 million in Enterprise revenues.

22.     Heather McCullar was a Charter Major Account Executive when Charter tried apply this accounting chicanery to one of her accounts. However, she blew the whistle, which ultimately lead to her termination.

23.     Subsequently, Charter altered its compensation plan documents to prevent it from proliferating even more. This change required the downward adjustment of payment completely down to the product segment.

24.     Seybold reported and opposed this policy through verbal communication and emails to his Director Robert Hadaway and Lynne Bell. In these emails, Seybold reported this policy and asserted that it was improper. In response, Seybold was threatened with termination and told, "Find the revenue, or we will find someone who will."

25.     Plaintiff reasonably believes and asserts that Charter's behavior described in this sub-section B.1. violated the Sarbanes-Oxley Act because the behavior constitutes one or more of the following: (1) it is securities fraud in violation of 18 U.S.C. Section 1348; (2) it violates a rule

and/or regulation of the SEC (including unlawfully cooking the books under 17 C.F.R. § 240.13b2-1); and/or (3) it violates federal law relating to fraud against shareholders.

**2.      The Second Straw – Seybold Opposes Moving Senior Living RGUs to Spectrum Community Solutions (SCS or Residential) While Leaving Same Accounts in Enterprise Billing**

26.      At the beginning of 2019, Charter again started altering their reportable work in a manner that presented no real change in corporate sales but that produced spreadsheets and reporting that appeared to show real and substantial changes. This occurred by moving thousands of senior citizens living in senior homes, assisted living, or similar residential settings where the contract was with the owner or landlord of the facility and not with the residents, from being a commercial account for billing purposes to being a SCS/residential account for billing purposes.

27.      For example, prior to the alteration, if Charter had a commercial account with a single nursing home that had a single bill for $1000 per month, and that nursing home had 100 residents, then the nursing home would count as a single Commercial RGU (Revenue Generating Unit). However, upon transitioning the nursing home from a commercial account to a SCS/residential account within Charter's CRM platform (Salesforce.com), Charter could report to Wall Street that they got 100 "NEW" residential RGUs (1 RGU for each senior resident @ $10 ea.).

28.      Unfortunately, if done ethically, this transfer would result in the lowering of commercial RGUs by one and the lowering of commercial revenues by $1000 a month. However, Charter did not want to show any such reductions to their commercial revenue because do so would require an explanation to its investors and Wall Street. Accordingly, although 100 new commercial consumers were shown for such an above change, the number of commercial consumers and the amount of commercial billing was not reduced. Thus, customers were double-counted, and Wall

Street and Charter's investors were led to believe that Charter was obtaining new residential consumers when it was not.

29.     When this was occurring, Seybold reported and opposed the conduct through numerous emails that went up and down the chain of command. These emails were considered unprofessional by Charter, even though Charter knew or should have known that the emails were or most likely were protected communications under the Sarbanes-Oxley Act. Indeed, Charter instructed Seybold not to engage in such whistleblowing behavior again.

30.     Plaintiff reasonably believes and asserts that Charter's behavior described in this sub-section B.2. violated the Sarbanes-Oxley act because the behavior constitutes one or more of the following: (1) it is securities fraud in violation of 18 U.S.C. Section 1348; (2) it violates rules and/or regulation of the SEC (including unlawfully cooking the books under 17 C.F.R. § 240.13b2-1); and/or (3) it violates federal law relating to fraud against shareholders.

### 3.     The Third Straw – Seybold Opposes Falsification of New Revenue Opportunities to Bolster Potential Revenue Valuation

31.     Most industries, including telecommunications providers, utilize a sales funnel system that focuses on a 5x's quota model for achieving successful sales results. Currently, telecommunications providers give 5-6 month ramp up periods for sales representatives to achieve a sales funnel of this size, which is a reasonable goal.

32.     A 5x's working funnel is one that sales professionals work to find new sales opportunities. While at times the sales professional will lose some and sell some within the funnel, a sales professional always needs to be adding new potential clients to the funnel, and some clients will also cycle in and out of the funnel. However, Charter, acting through its Group Vice President (GVP) Mr. Richard Twilley, created a KPI (Key Performance Indicator) that required 5x's quota in new opportunity creation every month, as opposed to the moving standard funnel.

33.     Under the prior 5x's funnel system, appropriate funnel would look like: **Quota = $1,000 Funnel = $5,000-$6,000 potential sales** over a 5-6-month period. In contrast, under the new KPI system, the appropriate funnel would look like: **Quota = $1,000 Funnel =$15,000-$18,000 potential sales** over same 5-6-month period.

34.     The fact that the new KPI metric was unattainable was evident from the beginning. No magic wand can change industry norms or alter market realities. If it takes a new Account Executive a 5-6 month ramp up period to build a standard 5x's working funnel with $5000-$6000 in potential sales, then it should take at least that long, or longer to triple the sales funnel to $15,000-$18,000.

35.     Even more, industrywide standards are based on market norms. Charter was essentially asking sales personnel to triple the amount of potential sales in their sales funnel overnight without any institutional alteration in sales systems, product pricing, or market changes.

36.     Accordingly, for such sales "projections" to be obtained, sales personnel either had to exaggerate their funnel or face termination.

37.     Sales leadership knew the answer was that sales personnel were fabricating sales opportunities in the CRM (customer relationship management) tool for the purpose of fattening the funnel of prospective business for new suitors looking to buy the company. However, this not only effects the overall stock valuation by Wall Street suitors, it also increases the revenue guidance that Charter provides to Wall Street and investors during quarterly revenue reports.  This greatly drives shareholder value, in addition to their personal stakes.

38.     Seybold reported and opposed such changes as long as possible. Such reporting and opposition included communications with human resources professionals. However, after informing HR of this mass fabrication of sales funnels under the new KPI metric and seeing that

HR was fully aware of the problem, it had no intention of sounding any alarms. Given that all other teams were being reviewed and rewarded on obviously inflated funnel methodology, Seybold had no choice but to allow his sales team to use similar methodology or face termination of himself and all of his team members.

39.     Included with Seybold's numerous attempts to return the funnel KPI to reality are emails that subsequently were cited by Charter as a part of the basis for terminating Seybold.

40.     Plaintiff reasonably believes and asserts that Charter's behavior described in this sub-section B.3. violated the Sarbanes-Oxley act because the behavior constitutes one or more of the following: (1) it is securities fraud in violation of 18 U.S.C. Section 1348; (4) it violates a rule and/or regulation of the SEC (including unlawfully cooking the books under 17 C.F.R. § 240.13b2-1); and/or (3) it violates federal law relating to fraud against shareholders.

**4.     The Final Straw – Seybold Opposes Across-the-Board Contract Errors Inherent in Charter's Payment Software that Defrauded Employees of Millions of Dollars of Commissions**

41.     Sometime in or around November of 2019, Mr. Seybold first noticed that new circuits (Ethernet PSU's) were not being compensated by Charter in accordance with the company's compensation plan. The plan applied to him, his team, and similarly situated teams.

42.     Seybold sent several emails reporting these errors to leaders in his chain of command and Andria Nesselrotte, who worked within Charter's compensation department.

43.     On February 5, 2020, having previously discovered that December 2019 commissions were being underpaid through a software system error, Seybold confirmed the error with the Charter Commissions Manager. Specifically, On February 5, 2020, Mr. Seybold received the following email that documents the payroll error:

| |
|---|
| **From:** Nesselrotte, Andria M <Andria.Nesselrotte@charter.com> |
| **Sent:** Wednesday, February 5, 2020 3:39 PM |
| **To:** Seybold, Darrell E <Darrell.Seybold@charter.com> |

**PLAINTIFF DARRELL SEYBOLD'S ORIGINAL S COMPLAINT – Page 10 of 21**

**Cc:** Newhaus, Marc <Marc.Newhaus@charter.com>
**Subject:** RE: Strategic Product - Account 8260132085405879

$450 billed MRR installed on account 8260132085045879 in June and the strategic product was paid that month as well.



An additional $450 installed on the same account number in December.  Strategic product was not eligible for commission on this account again since the PSU was paid in June.

44.       On February 6, 2020, Mr. Seybold brought the error to the attention of his Charter Communications chain of command after confirming the same error was applied to November of 2019 commissions and requested the error be fixed because it represented real money for both himself and his team members. He expressly lodged "a formal dispute on behalf of myself, my team and my director." Specifically, Mr. Seybold sent an email to fix the error. Importantly, Mr. Seybold recognized that this error did not affect him only, but that it affected all similarly paid persons "enterprise wide." Finally, he made it clear that he was requesting a fix for more than himself, stating, "Please take this email as a formal dispute on behalf of myself, my team and my director to have the PS3 commission component of the 2019 Sales Compensation Plan recalculated and applied correctly."

**From:** Seybold, Darrell E
**Sent:** Thursday, February 6, 2020 11:40 AM
**To:** Nesselrotte, Andria M <Andria.Nesselrotte@charter.com>
**Cc:** Newhaus, Marc <Marc.Newhaus@charter.com>; Bell, Lynne P
<Lynne.Bell@charter.com>
**Subject:** RE: Strategic Product - Account 8260132085405879

Looping in Lynne Bell as this is enterprise wide.

Andria,

Thank you so much for your help! Below is the comp plan verbiage pertaining to paying PS3 commission on all new Ethernet nodes being added to existing accounts (attached comp plan, page 7 bottom of page).

"2. Strategic Product PSU and Renewal Commissions
        a. Performance Measure 3 (PM3): Strategic Product PSU MRR – This Plan provides additional commissions for opportunities sold and MRR verified for either New Metro Ethernet PSU MRR, New Hosted Voice PSU MRR or New Managed Network Product MRR generated by their respective teams. Additional commissions will be paid for all billed opportunities regardless of when booked.

A new Metro Ethernet PSU is defined as:
        i. New and existing customers signing an agreement for a New Metro Ethernet Product. The New Metro Ethernet Product can be a New PSU to an existing Metro Ethernet Network. (Fiber and Complex Coax)
        ii. New and Existing customers are eligible.
        iii. Bandwidth upgrades do not qualify for additional commissions.
                                                                              iv.
Example: Total Installed New Metro Ethernet PSU MRR x Pay Factor = New Metro Ethernet Commissions Earned"

Based on the fact that new nodes/PSUs can be applied to existing networks, there has been a misapplication of the 2019 comp plan. Based on the explanation you provided below for December of 2019, I have not been paid correctly on the PS3 component of my attached 2019 Sales Manager Compensation Plan for the entire year of 2019. This would also conclude that the same component of the AE comp plans and SE comp plans have also been applied erroneously since they all have the same qualification verbiage.

Needless to say, this a lot of money in my individual instance and for several team members as well. November's misapplication (Attached) resulted in unpaid PS3 commissions totaling $1,325.25. I know there were huge misses in August, September and May as well.

Please take this email as a formal dispute on behalf of myself, my team and my director to have the PS3 commission component of the 2019 Sales Compensation Plan recalculated and applied correctly.

45.     On February 18, 2020, through a 7:59 am email, Mr. Seybold followed up on the requested correction to the November commissions and specifically asked for a timeline so he could decide a "plan of action." At this time, he stated, "I need to know timeline to completion in order to determine my course of action." Although the email was sent to Andria Nesselrotte in the

Compensation department, Mr. Seybold copied his director, commissions manager and commissions director.

> **From:** Seybold, Darrell E
> **Sent:** Tuesday, February 18, 2020 7:59 AM
> **To:** Nesselrotte, Andria M <Andria.Nesselrotte@charter.com>
> **Cc:** Newhaus, Marc <Marc.Newhaus@charter.com>; Snelling, Dana C <Dana.Snelling@charter.com>
> **Subject:** FW: Strategic Product - Account 8260132085405879
>
> Andria,
> I wanted to follow up on the November commission dispute and the status of procuring my monthly commission statements going back to January of 2018. Please let me know a timeline for completion, as timeline to correct will determine course of action.
> Thank you,

46.    In the hours following Mr. Seybold's prior email, Charter Communications made some thoughtless and patently illegal actions.

a.    At 10:04am, Andria Nesselrotte, Commissions Manager, responded in writing with information that confirmed that the same misapplication took place on the November report. She copied both her director and Mr. Seybold's director.

b.    At 11:30am, Mr. Seybold was called by his director and told to return to the office for a 1:30 meeting with one of Charter's HR representatives. Mr. Seybold rightfully believed that the purpose of the meeting was to get more information on the commission errors.

47.    Later that day, at 1:30 pm, instead of fixing the error, which could cost hundreds of thousands, if not millions, of dollars, Charter terminated Mr. Seybold, falsely alleging at the time that his termination was based on the unprofessional communications.

48.    However, there is nothing unprofessional about any of the above communications. Accordingly, Charter has subsequently asserted that the above was only the last straw on a line of unprofessional communications. However, both the communications above and most, if not all, of the alleged "unprofessional communications" were related to Mr. Seybold's reporting of and

opposition to illegal or unethical conduct which violates the SOX. Accordingly, Mr. Seybold's termination is a result of protected activity and in violation of SOX.

49.     Plaintiff reasonably believes and asserts that Charter's behavior described in this sub-section B.4. violated the Sarbanes-Oxley act because the behavior constitutes one or more of the following: (1) it is mail fraud in violation of 18 U.S.C. Section 1341; (2) it is wire fraud in violation of  18 U.S.C. Section 1343; (3) it is securities fraud in violation of 18 U.S.C. Section 1348; and/or (4) it violates a rule and/or regulation of the SEC (including unlawfully cooking the books under 17 C.F.R. § 240.13b2-1).

50.     Plaintiff also asserts that the conduct described in this sub-section B.4. constitutes breach of contract in the form of failing to pay commissions earned as to him and all similarly situated employees.

**C.      The Harm**

51.     As a result of Charter's breach of contract, Seybold has suffered loss of pay due him for commissions under his prior employment contract.

52.     As a result of his wrongful termination, Seybold has suffered a loss of income and benefits and mental anguish.

53.     Seybold has also been compelled to incur attorney's fees recoverable under the Sarbanes-Oxley Act of 2002.

**D.      The Case Is Not Subject to Arbitration**

54.     Prior to the filing of this litigation, Charter has asserted that Seybold is subject to its employment policy requiring binding arbitration.

55.     However, pursuant to 18 U.S. Code Section 1514A (e) (2), "No predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a

dispute arising under this section." Accordingly, the Court cannot be stripped of its ability to adjudicate Seybold's SOX claim.

56.     Further, as to Plaintiff's breach of contract claim, Seybold asserts that when Charter first implemented its binding arbitration policy, it allowed employees to opt out of that agreement, and Seybold exercised that option. He refused to agree to Charter's offer of binding arbitration, expressly opted out by of the policy, and saved the electronic receipt of that opt out decision. However, the copy of that receipt was on his work computer thumb drive, and upon his termination, Charter refused to allow Seybold access to his office or computer or provide Seybold a copy of his thumb drive.

57.     Thus, as to the parties' dispute as to whether there is an arbitration agreement, this dispute should be determined by this Court.

## IV.  LEGAL FOUNDATION

58.     To succeed on claim that his or her employer violated the Sarbanes-Oxley Act's prohibition on retaliating against whistleblowers, "an employee must prove by a preponderance of the evidence that (1) [the employee] engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) [the employee] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Allen v. Administrative Review Bd.,* 514 F.3d 468, 475-76 (5th Cir.2008) (citing *Collins v. Beazer Homes USA, Inc.,* 334 F.Supp.2d 1365, 1379 (N.D.Ga.2004)). A "contributing factor" is "*any* factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Id.* at 476 n.3.

59.     Regarding protected activity – the Sarbanes Oxley Act prevents publicly-traded companies like Charter from retaliating against an employee who reports information to a superior

"regarding any conduct which the employee reasonably believes constitutes a violation" of one of six enumerated categories in § 1514A. 18 U.S.C. § 1514A(a)(1).

60.     The complaint must "definitively and specifically relate" to one of these categories, which include: (1) 18 U.S.C. § 1341 (mail fraud); (2) 18 U.S.C. § 1343 (wire fraud); (3) 18 U.S.C. § 1344 (bank fraud); (4) 18 U.S.C. § 1348 (securities fraud); (5) any rule or regulation of the SEC; or (6) any provision of federal law relating to fraud against shareholders. *Allen,* 514 F.3d at 476–477. Two Fifth Circuit cases highlight that "SOX's "critical focus is on whether the employee *reported conduct* that he or she *reasonably believes* constituted a violation of federal law." *Wallace v. Tesoro Corp*., 796 F.3d 468, 479 (5th Cir. 2015), citing  *Villanueva v. U.S. Dep't of Labor,* 743 F.3d 103, 109 (5th Cir.2014) (emphasis in original).

61.     One SEC regulation, which Plaintiff asserts herein that Charter violated by the actions described in sub-sections B.1-4. above, sates, "No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act." 17 C.F.R. § 240.13b2-1, enacted by the SEC pursuant to 15 U.S.C. 78m(b)(2).

62.     Regarding reasonable belief, the trial court scrutinizes the employee's "reasonable belief" that a violation occurred under both a subjective and objective standard. *Allen,* 514 F.3d at 477. The objective reasonableness of a plaintiff's belief is evaluated based on the knowledge available to a reasonable person in the same factual circumstances, with the same training and experience as the aggrieved employee. *Id.* (citations omitted). The Fifth Circuit has equated the "objective reasonableness" standard to be used in Sarbanes–Oxley cases with the standard used in the Title VII retaliation context. *Id.* The objective reasonableness of an employee's belief therefore cannot be decided as a matter of law if there is a genuine issue of material fact, meaning that

"reasonable minds could disagree on [the] issue." *Id.* at 477–478 (citing *Lipphardt v. Durango Steakhouse of Brandon, Inc.,* 267 F.3d 1183, 1188 (11th Cir.2001)).

63.     An employee must file a SOX whistleblower claim with the Department of Labor within 180 days of the alleged employment action, and if the Secretary of Labor has not reached a final answer on that claim within 180 days, the employee may file a *de novo* action sounding in law and/or equity in the appropriate federal district court and shall have the right to a trial by jury as to all jury issues. 18 U.S. Code §1514A (b). "*De novo*" review essentially means that a SOX whistleblower has an unwavering right to start afresh in the district court, and the presiding judge should not defer to OSHA's findings or to the ALJ's rulings. *See, Stone v. Instrumentation Lab. Co.*, 591 F.3d 239 (4th Cir. 2009).

64.     After a 2010 amendment, employees asserting a SOX claim have the express right to a jury trial. *See,* 18 U.S. Code §1514A (b) (2) (E).

65.     Statutory damages in a Sarbanes-Oxley Act claim expressly include:

**(c) REMEDIES.—**
    **(1) IN GENERAL.—** An employee prevailing in any action under subsection (b)(1) shall be entitled to all relief necessary to make the employee whole.
    **(2) COMPENSATORY DAMAGES.—**Relief for any action under paragraph (1) shall include—
        **(A)** reinstatement with the same seniority status that the employee would have had, but for the discrimination;
        **(B)** the amount of back pay, with interest; and
        **(C)** compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees.

18 U.S.C. § 1514A (c).

66.     Under the Court's equitable powers and the language of the Act, if the Court finds that equitable reinstatement is unfeasible in a SOX whistleblower claim, the Court may award equitable front pay as an alternative to reinstatement. *See Deltek, Inc. v. Department of Labor, Administrative Review Bd.*, 649 Fed.Appx 320, (4th Cir. 2016), citing *Bryant v. Mendenhall*

*Acquisition Corp.,* No. 04–014, 2005 WL 1542547, at *6 (Dep't of Labor June 30, 2005) ("Under Sarbanes–Oxley, a prevailing employee is entitled to all relief necessary to make the employee whole" 18 U.S.C. § 1514A(c)(1), and front pay 'is designed to place the complainant in the identical financial position' that she would have occupied had she remained employed or been reinstated." (internal quotation mark omitted)).

67.   In SOX claims, back pay, reinstatement, and front pay have been considered equitable relief. Equitable issues are usually considered questions for the court, but a jury trial may be appropriate to decide the issue. The parties may consent to have one or more of these issues tried by a jury or the court may try the issue with the question of front pay or back pay presented to the jury as an advisory jury question for such equitable issues. Fed. R. Civ. P. 39(c); *see also Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*, 261 F.3d 512, 526 (5th Cir. 2001).

68.   In contrast, non-economic damages recoverable as compensatory damages in a SOX claim include mental anguish, emotional distress, and reputational harm. *See, e.g. Halliburton, Inc. v. Administrative Review Bd.*, 771 F.3d 254, 266 (5th Cir. 2004).

69.   Post-judgment interest on a backpay award tried in district court under 18 U.S.C. § 1514a(b)(1)(b) is governed by 28 U.S.C. § 1961.

## V.  FIRST CAUSE OF ACTION- SARBANES-OXLEY WHISTLEBLOWING

70.   Plaintiff realleges each allegation set forth in the paragraphs above.

71.   By reason of the foregoing, Charter proximately caused actual damages to Plaintiff Darrell Seybold by wrongfully terminating his employment in retaliation for Seybold's protected SOX whistleblowing conduct, in that Seybold was terminated in whole or in part because he:

     a.   Reported and opposed improper retagging of networks to claim new revenue that should be renewal revenue;

b.  Reported and opposed moving senior living RGUs to spectrum community solutions (SCS or Residential) while leaving same accounts in Enterprise billing;

c.  Reported and opposed falsification of new revenue opportunities to bolster potential revenue valuation; and

d.  Reported and opposed across-the-board contract errors inherent in charter's payment software that defrauded employees of millions of dollars of commissions.

72.  Charter's termination of Seybold violated the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1514A (a) (1).

73.  Seybold has been injured by his wrongful termination and as a result should receive compensatory legal damages and equitable remedies, including but not limited to: compensatory damages; back pay; equitable reinstatement if feasible or equitable front pay; mental anguish, emotional distress, and loss of enjoyment life damages; lost benefits in the past and in the future; special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees; and any and all other compensatory damages or equitable relief that the Court finds just and/or right under 18 U.S.C. §1514A (c).

## VI.  SECOND CAUSE OF ACTION – BREACH OF CONTRACT

74.  Plaintiff realleges each allegation set forth in the paragraphs above, including without limitation the allegations in sub-section B.4. On pages 10-14.

75.  By failing to maintain a software system that included all elements of Plaintiff's compensation, Charter failed to pay Plaintiff all commissions and payments due him under his employment contract and compensation agreement, thus breaching its contract with Seybold.

76.     Seybold has been injured by this breach and as a result should receive benefit of the bargain damages in the form of unpaid commissions and reasonable attorney fees; and any and all damages or equitable relief that the Court finds just and/or right.

## VII.  JURY DEMAND

77.     Although the Plaintiff seeks an equitable order of reinstatement or equitable front pay in the alternative, even cases with remedies sounding in equity, to the extent there are one or more issues of fact or law suitable for a jury, the Plaintiff respectfully requests a jury trial on all such issues.

## VIII.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Darrell Seybold seeks relief against the Defendant Charter, as follows:

1.  That this matter be submitted to a trial by jury on all legal issues and tried as a bench trial for all issues of equity with advisory questions submitted to the jury as the Court deems appropriate; and

2.  That Judgment be entered against Defendant Charter Communications, Inc.,

    a.  Finding that Defendant violated 18 U.S.C. Section 1514A (a) (1) by terminating Plaintiff's employment in retaliation for protected conduct;

    b.  Awarding Plaintiff compensatory damages and equitable relief, including back pay; equitable reinstatement or equitable front pay; loss benefits in the past and in the future; mental anguish and loss of enjoyment of life; litigation costs, expert witness fees, reasonable attorney fees, cost of court and all other legal damages or equitable relief that the Court finds just and right under Section18 U.S.C. Section 1514A (c);

**PLAINTIFF DARRELL SEYBOLD'S ORIGINAL S COMPLAINT – Page 20 of 21**

c.  Award Plaintiff breach of contract damages and reasonable attorney fees for Charter's failure to pay Plaintiff's earned commissions;

d.  As to all claims for relief, that Plaintiff be awarded his costs of court, pre-judgment interest, post-judgment interest, and all such other and further relief in law or equity as the Court deems to be just and right.

Respectfully submitted,

/s/ Eric N. Roberson
_____
Eric N. Roberson
State Bar No. 08158100
ENR@kilgorelaw.com
Kilgore & Kilgore, PLLC
3109 Carlisle Street
Dallas, Texas 75204
(214) 379-0817
(214) 379-0840 (telecopy)
**COUNSEL FOR DARRELL SEYBOLD**